UNITED STATES DISTRICT COURT                          <u>FOR ONLINE PUBLICATION</u>
EASTERN DISTRICT OF NEW YORK                          <u>ONLY</u>
---------------------------------------------------------------- X
PAULINA DEMARCO,                                     :
                                                     :
                                  Plaintiff,         :              MEMORANDUM
                                                     :              <u>AND ORDER</u>
                - against -                           :
                                                     :              06-CV-4305 (JG) (ARL)
                                                     :
STONY BROOK CLINICAL PRACTICE                        :
MANAGEMENT PLAN, and THE RESEARCH                    :
FOUNDATION OF THE STATE UNIVERSITY                   :
OF NEW YORK,                                         :
                                                     :
                                  Defendants.        :
---------------------------------------------------------------- X

A P P E A R A N C E S :

        THOMPSON WIGDOR & GILLY LLP
                350 Fifth Avenue, Suite 5720
                New York, New York 10118-0110
        By:     Douglas H. Wigdor
                Kathryn J. Webber
                Attorneys for Plaintiff

        GARFUNKEL, WILD & TRAVIS, P.C.
                111 Great Neck Road, Suite 503
                Great Neck, New York 11021
        By:     Leonard M. Rosenberg
                Lauren M. Levine
                Wilhelmina A. de Harder
                Attorneys for Defendant Stony Brook Clinical Practice Management Plan

        LANDMAN CORSI BALLAINE & FORD P.C.
                120 Broadway
                New York, New York 10271-0079
        By:     Rebecca W. Embry
                Attorneys for Defendant Research Foundation of the
                State University of New York

JOHN GLEESON, United States District Judge:

        Paulina DeMarco brings this employment discrimination action against Stony

Brook Clinical Practice and Management Plan ("CPMP") and the Research Foundation of the

State University of New York ("Research Foundation"), alleging that the defendants discriminated against her on the basis of her sex and pregnancy when CPMP made the decision, which Research Foundation supported, not to hire her for a data analyst position. DeMarco alleges violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* and New York State Executive Law, Human Rights Law, § 290 *et seq.* She further claims that the defendants failed to hire her in retaliation for engaging in the protected activity of filing an employment discrimination lawsuit against her former employer. Defendants move for summary judgment pursuant to Fed. R. Civ. P. 56.

As discussed more fully below, DeMarco deliberately misled the defendants about her current and recent employment status when she applied and interviewed for the data analyst position. When her deception came to light, the defendants, who up to that point had figured DeMarco would be a "good fit" with the rest of their staff, decided she could no longer be trusted and elected not to hire her. As a matter of law, that decision was not actionable employment discrimination. Accordingly, the motion is granted.

## BACKGROUND

A.      *CPMP and its Department of Information Systems*

The facts of this case, viewed in the light most favorable to DeMarco, are as follows. The CPMP is authorized by the Board of the State University of New York ("SUNY") to provide a faculty practice plan for the School of Medicine at Stony Brook University. CPMP's Rule 56.1 Statement ¶ 1; Cohen Aff. ¶ 4; Cohen Dep. at 8. Faculty practice plans are organizations that collect and disburse monies on behalf of a medical school faculty. *Id.* They are established in many medical schools to facilitate the clinical faculty's efforts to provide

professional medical services to patients.  Through these plans, members of the medical faculty are able to supplement their teaching income.  CPMP's Rule 56.1 Statement ¶ 2; Cohen Aff. ¶ 4.

CPMP provides billing, collection, disbursement and financial reporting services to the clinical practices at SUNY's medical school at Stony Brook.  CPMP also analyzes patient demographics and tracks, reports, and analyzes practice plan activities.  Because most of its data is electronic, CPMP relies heavily on the services of its Department of Information Systems. CPMP's Rule 56.1 Statement ¶ 3; Cohen Aff., ¶ 5; Cohen Dep. at 8.

Employees of the Department of Information Systems regularly access and use highly confidential data (including patients' health information, such as diagnosis and treatment plans and sexually transmitted diseases; identification information about patients and physicians, including birth dates, social security numbers, and addresses; and individual physician and group practice revenue and financial information).  CPMP's Rule 56.1 Statement ¶ 4; Pl.'s Rule 56.1 Counter-statement ¶ 4.  Accordingly, employees who work in CPMP's Department of Information Systems must be trustworthy and honest.  *Id.*; *see also* Bergan Aff. ¶32; Teriaco Aff. ¶ 24; Cohen Dep. at 79; Bergan Dep. at 224; Teriaco Dep. at 207.

B.  *The Relationship Between Research Foundation and CPMP*

The Research Foundation is a private, non-profit educational corporation founded for the benefit of the State University of New York ("SUNY").  Research Foundation's Rule 56.1 Statement ¶ 1; Pl.'s Rule 56.1 Counter-statement ¶ 1.  For a fee, Research Foundation provides personnel staffing and fiscal services to CPMP, including supplying payroll checks, processing benefits, and conducting computer system oversight.  Kelly Dep. at 26, 27.  All positions at CPMP are filled by employees of the Research Foundation, but CPMP is responsible for the day-to-day supervision and management of CPMP staff and operations.  Research

Foundation's Rule 56.1 Statement ¶ 2; Kelly Dep. 166; Cohen Aff. ¶ 9. CPMP has the ability to hire employees without obtaining the Research Foundation's consent, so long as CPMP abides by the policies and procedures of the Research Foundation set forth in its personnel manual. Manning Dep. at 36; Kelly Dep. at 166-68; Cohen Dep. at 13. CPMP sometimes consults with the Research Foundation before taking employment action. Kelly Dep. at 166-67; Cohen Aff. at 27. [1] Though it has never done so, the Research Foundation would have the authority to refuse to hire an applicant for a position with CPMP, but the Research Foundation would not have the authority to instruct CPMP to hire an individual CPMP did not wish to hire. Bergan Dep. at 248-49; Kelly Dep. at 57.

CPMP must also abide by the Research Foundation's policies and procedures when it wishes to fire an employee. Furthermore, if CPMP wishes to terminate someone, they must procure Research Foundation's approval. Bergan Dep. at 244.

The Research Foundation provides these advisory services indirectly to CPMP through Stony Brook University, which acts as a liaison to CPMP, and is responsible for ensuring that CPMP obeys the Research Foundation's policies and procedures. Kelly Dep. at 26-28.

C.    *The Process for Hiring at CPMP*

When CPMP needs to hire an employee, it prepares a proposal detailing job qualifications, a job description, a salary range, a recruitment plan and the application procedures for SUNY's Human Resources Office, which acts on behalf of the Research Foundation. Once

---

[1] Plaintiff states that "CPMP is required to send all potential hires to Research Foundation Human Resources staff for approval, and these or other Research Foundation employees have the ability to refuse to hire any proposed employees." Plaintiff's Rule 56.1 Counter-statement ¶ 3. She cites the deposition of Ellen Cohen (Executive Director of CPMP) at 18, 27-28, the deposition of Manning at 4, and CPMP's own Rule 56.1 Statement ¶¶ 7,12, but none of those sources supports this proposition. Cohen does say that Research Foundation is authorized to instruct CPMP as to personnel decisions, but that is not the same as requiring them to send potential hires to Research Foundation for approval.

the Human Resources Office approves the proposal, the job is posted and advertised. Prospective candidates are directed to forward a cover letter and resume to CPMP. CPMP then reviews the letters and determines which applicants, if any, meet the minimum requirements. CPMP's Rule 56.1 Statement ¶ 9; Pl.'s Rule 56.1 Counter-statement ¶ 9; Bergan Dep. at 246-47.

To ensure that its hiring practices comply with the policies set by SUNY and state and federal law, CPMP is required to interview every applicant who meets the requirements established by the Research Foundation and SUNY. Applicants who meet the baseline qualifications are first invited to appear before a Search Committee, which is comprised of the immediate supervisor or department director of the position to be filled and any other individuals recommended by Ellen Cohen, Executive Director of CPMP. The Search Committee meets with the applicant to review the applicant's resume, discuss prior employment, education, skills and experience, and assess the applicant's demeanor and qualifications. If the applicant is qualified, she is required to complete a reference form. When the interview is over, the Search Committee discusses the applicant and either makes a positive or a negative recommendation to CPMP's Department of Human Resources. CPMP's Rule 56.1 Statement ¶ 10; Pl.'s Rule 56.1 Statement ¶ 10; Bergan Dep. at 58, 246-47.

If the Search Committee makes a positive recommendation, the applicant has a second interview with the managers to whom the applicant would report if hired. The managers then report their recommendations to the Department of Human Resources. CPMP's Rule 56.1 Statement ¶ 11; Pl.'s Rule 56.1 Counter-statement ¶ 11; Bergan Aff. ¶11.

Once CPMP decides to recommend an applicant for a position, CPMP refers the applicant's appointment package[2] to SUNY's Equal Employment Opportunity Committee

---

[2] An appointment package consists of a summary of recruiting activity, the job description, the resumes of all applicants who were interviewed, a description of pre-search activities, a mid-search summary of the

("EEO Committee"). After the EEO Committee reviews and approves the applicant, the appointment package is then referred to SUNY's Affirmative Action Committee ("AA Committee"). SUNY's EEO Committee and AA Committee act on behalf of the Research Foundation. Bergan Dep. at 146, 284. At the same time that the applicant's appointment package is under review by the various committees, CPMP must contact and verify the employment references provided by the applicant. CPMP's Rule 56.1 Statement ¶ 14; Pl.'s Rule 56.1 Counter-statement ¶ 14.

Any discussions between CPMP and an applicant concerning salaries, start dates, and job offers are preliminary and unofficial because offers of employment are at all times subject to the completion of the process described above. Applicants are informed that no offers are final until their references are checked and their applications are fully processed, which can take several weeks. Bergan Dep. at 141-42, 289. CPMP also tells all applicants who are currently working not to give notice to their current employers until they receive notice that their appointments have been approved, at which time they will receive a formal written offer of employment from the Research Foundation. The offer letter describes the position, salary, and start date, and requests that the applicant sign the letter acknowledging acceptance of the written offer of employment. Bergan Aff. ¶15; Bergan Aff., Ex. 2.

D.    *DeMarco's Application and Interview with CPMP*

DeMarco applied for a junior data analyst position at CPMP on January 11, 2005. *See* Bergan Aff., Ex. 3, 4. The employment application requires applicants to list all employment and periods of unemployment of more than one month. Bergan Aff., Ex. 4. By

---

candidates who were deemed to meet the minimum qualifications and/or who were interviewed, and a post-search/pre-hire summary which describes the reasons why persons interviewed were not hired and provides demographics on the proposed applicant. CPMP's Rule 56.1 Statement ¶ 13; Pl.'s Rule 56.1 Counter-statement ¶ 13.

signing the employment application, DeMarco authorized the "investigation of all statements contained in [her] application and attached data as provided." She "certified that such statements are true and [that she understands] that misrepresentation or omission of facts called for in [her] form may be cause for termination of employment without notice." *Id.* Her job application was accurate at the time that she submitted it. Pl.'s Rule 56.1 Counter-statement ¶ 19.

Joan Gossner, Director of IDX Software Applications, and Darren Mikalsen, CPMP's Data Manager, conducted an interview of DeMarco in early 2005. DeMarco was not recommended for the position because her qualifications did not match CPMP's requirements. CPMP's Rule 56.1 Statement ¶ 18; Pl's Rule 56.1 Counter-statement ¶ 18.

In the summer of 2005, the Information Systems Department was recruiting for a data analyst, but was having difficulty filling the position. After the Department modified the requisite qualifications, Mary Bergan, CPMP's Manager of Human Resources, informed DeMarco of the position and suggested that she apply for it. CPMP's Rule 56.1 Statement ¶¶ 20-21; Pl.'s Rule 56.1 Counter-statement ¶¶ 20-21.

In July of 2005, DeMarco was working at West Hills Montessori School, Gersh Management Services, Inc., and Gersh Academy (collectively, "Gersh") as business coordinator. CPMP's Rule 56.1 Statement ¶ 22; Pl.'s Rule 56.1 Counter-statement ¶ 22. Her job duties included calendaring appointments, placing and receiving telephone calls, and running errands. DeMarco Aff. ¶ 5.

DeMarco has alleged that during her employment with Gersh, the founder of the academy, Kevin Gersh, sexually harassed her by sending her unsolicited pornographic e-mails, asking her to order strippers for him, telling her stories of his sexual exploits, and making

unwanted sexual advances towards her. DeMarco Aff. ¶ 6. On August 23, 2005, she resigned from her position at Gersh. DeMarco Aff. ¶ 7.

On July 21, 2005, DeMarco faxed her resume, which included a section entitled "Experience Summary," to CPMP. DeMarco Aff., Ex. A; Bergan Aff., Ex. 5. DeMarco failed to list her then-current employer, Gersh. The latest position listed was her position as a managed care CDM Coordinator at John T. Mather Memorial Hospital ("Mather") from July 2004 to April 2005. DeMarco Aff., Ex. A; CPMP's Rule 56.1 Statement ¶ 23. DeMarco asserts that she omitted her employment with Gersh because she was unprepared to discuss the sexual harassment she had endured there, and she was afraid that her employer at Gersh would do physical violence to her if he learned of her application to CPMP. DeMarco Dep. 117, 128.

In early August 2005, Bergan's assistant called DeMarco to schedule an interview with the CPMP Search Committee for the data analyst position. CPMP's Rule 56.1 Statement ¶ 24; Pl.'s Rule 56.1 Counter-statement ¶ 24. On August 29, 2005, DeMarco met with the CPMP Search Committee, which was comprised of the following individuals: Laura Armandi, Assistant Director of Financial Affairs, Joan Gossner, Director of IDX Software Applications, Catherine Jones, Manager of Professional Affairs, Charles Kentros, Director of Reimbursement/Managed Care, Salena Circo, Assistant Manager of IDX Bar Operations, and Mary Bergan, Manager of Human Resources. CPMP's Rule 56.1 Statement ¶¶ 25-26; Pl.'s Rule 56.1 Counter-statement ¶¶ 25-26. In response to the Committee's question about the circumstances under which she left Mather in April 2005, DeMarco stated that she stopped working because she did not have enough time to devote to her schoolwork. At the time, she was working toward a degree in Healthcare Administration at St. Joseph's College. DeMarco Dep. at 100, 101. CPMP asserts that DeMarco falsely stated that she had not been working since she left Mather in April.

Armandi Aff. ¶ 13.  For her part, DeMarco testified that she did not "recall specifically" saying

that.  DeMarco Dep. at 100.  She added that she "[did not] believe" she told the interviewers she

had not worked since leaving Mather, but she was "not positive."  *Id*.

DeMarco admits to intentionally failing to disclose her employment at Gersh

because she did not want CPMP to know about it.  DeMarco Dep. at 101; Bergan Dep. at 120.

She claims that the Search Committee asked whether she was currently working, and that her

negative response was literally truthful because she had resigned from Gersh a few days before.

DeMarco Dep. at 99-100.

In its recommendation, the Committee noted that DeMarco appeared to be

"adequately qualified" and that she had "a positive attitude and seems to be a good fit for our

organization."  Armandi Aff., Ex. 3.   The Committee members decided that she should be called

back for a second interview with CPMP's Data Manager, Darren Mikalsen, and its Director of

Information Systems, Robert Teriaco.  Armandi Aff. ¶ 16.

On September 14, 2005, DeMarco came back for the second interview.  CPMP's

Rule 56.1 Statement ¶ 31; Pl.'s Rule 56.1 Counter-statement ¶ 31.  Teriaco and Mikalsen

questioned her about her work experience, and they recall specifically asking her why she had

left Mather and what she had been doing since that time.  Teriaco Dep. at 108-09; Mikalsen Dep.

at 149-150.  However, DeMarco maintains that she was not asked specifically whether she had

worked anywhere after leaving Mather.  DeMarco Dep. at 107.  She recalls being asked whether

she was currently working.  In response, she states that she again answered truthfully:  "I'm

doing miscellaneous stuff, and I'm looking for more full-time, steady position."  *Id.*  She also

stated that she was still in school.  *Id.* at 108.

DeMarco told Teriaco and Mikalsen that she left Mather in April 2005 because she was attending St. Joseph's College and her workload at the hospital was interfering with her education. CPMP's Rule 56.1 Statement ¶ 35; Pl.'s Rule 56.1 Counter-statement ¶ 35. Teriaco and Mikalsen recorded her answers by writing notes on copies of DeMarco's resume. *See* Teriaco Aff., Ex. 2; Mikalsen Aff., Ex. 2. Plaintiff contends that these notes were not written contemporaneously with the interview. Pl.'s Rule 56.1 Counter-statement ¶ 37.

Mikalsen and Teriaco also asked DeMarco about her skills in utilizing certain computer programs and applications that would be required for the data analyst position. CPMP's Rule 56.1 Statement ¶ 39; Pl.'s Rule 56.1 Counter-statement ¶ 39. DeMarco did not possess all of the skills necessary for the position; if hired, she would have to undergo additional training. CPMP's Rule 56.1 Statement ¶ 40; Pl.'s Rule 56.1 Counter-statement ¶ 40. Still, Teriaco and Mikalsen believed that DeMarco would be a good fit. CPMP's Rule 56.1 Statement ¶ 41; Pl.'s Rule 56.1 Counter-statement ¶ 41.

Teriaco informed DeMarco that CPMP planned to offer her the position, but that any final offer of employment could only be made after SUNY's EEO and AA Committees approved her appointment and after her references were checked. Mikalsen Dep. at 36, 64, 185; Teriaco Dep. at 122, 149; DeMarco Dep. at 112. In other words, CPMP asserts that the offer of employment was conditional, the condition being satisfactory reference checks. DeMarco insists there was no such condition. Though the materiality of this claimed dispute of facts is not clear to me, it is crystal clear that the conditional nature of CPMP's offer of employment is not genuinely in dispute, and DeMarco's contrary claim is frivolous.[3]

---

[3] It also appears to be disingenuous. DeMarco, apparently anticipating her filing of this lawsuit, recorded her phone conversations with Bergan and Barbara Pell (Research Foundation's Employee Relations and Affirmative Action Manager) on October 4, 2005. In the conversation with Bergan, DeMarco said, "I met with Bob Teriaco and Darren. And they made me an *informal offer pending my reference check*." *See* Ex. P of Wigdor Aff.,

Teriaco advised Bergan of their recommendation that DeMarco be hired and asked Bergan to begin processing the paperwork for her arrival. Teriaco Dep. at 104. To speed up the normal approval process, Bergan sent DeMarco's package to the EEO Committee prior to checking DeMarco's references. CPMP's Rule 56.1 Statement ¶ 46; Pl.'s Rule 56.1 Counter-statement ¶ 46. On September 20, 2005, the EEO Committee approved DeMarco's package, and the package was then referred to the AA Committee for approval. *Id.*

E.    *The Reference Checks*

After her interview with Teriaco and Mikalsen on September 14, 2005, DeMarco filled out a CPMP Reference Form so that Mikalsen could verify her prior work experiences. CPMP's Rule 56.1 Statement ¶ 47; Pl.'s Rule 56.1 Counter-statement ¶ 47. On September 21, 2005, Mikalsen began doing the reference checks. Mikalsen Dep. at 206-17.[4]

Margaret McVey, a nurse administrator at the University Hospital at Stony Brook, where DeMarco had worked from 1992 to 1996, was DeMarco's first reference. McVey barely remembered DeMarco, but stated that DeMarco was a good employee and was good under pressure. Mikalsen Dep. at 224-25; Wigdor Aff., Ex. U. Mikalsen next contacted Sherry Elliot, the Director of Health Information Management at Central Suffolk Hospital, where DeMarco worked from July 2003 to July 2004. Elliot told Mikalsen that she recalled that DeMarco had

---

at 3 (emphasis added). She said the same thing to Pell. *Id.* at 5 ("[T]hey said it was an informal offer pending my reference check.").

When asked at oral argument how this issue could be genuinely in dispute given DeMarco's own assertion that the offer was conditional, her counsel asserted that *CPMP* regarded the offer as unconditional, despite its employees' deposition testimony to the contrary. Counsel cited an e-mail from Teriaco to Laura Armandi dated September 15, 2005, which counsel argued, stated "Darren and I met with Paulina and have extended her an offer." Transcript of August 29, 2008 oral arg., at 19. But counsel left out the e-mail's explicit mention that the offer was "[p]ending the outcome of reference checks and the normal red tape for hiring a person." *See* Ex. K to Wigdor Aff.

In sum, every bit of evidence on the subject, including the evidence cited by DeMarco's counsel, explicitly establishes the conditional nature of CPMP's offer of employment to DeMarco.

[4]    DeMarco contends that the precise timing of Mikalsen's calls to DeMarco's references is a factual question for trial. DeMarco believes that Mikalsen did not actually call her references until after she had informed CPMP on September 22 that she was pregnant and had a sexual harassment suit pending against her prior employer. *See* Bergan Aff., Ex. 9.

some attendance problems during her employment, but she would not elaborate.  Mikalsen Dep. at 207-08.  In an affidavit dated May 22, 2008, Elliot stated that DeMarco was a "hard-working and productive employee"; and that while she was absent from work on a few occasions, those absences were approved in advance or were otherwise excused.  Wigdor Aff., Ex. T.   Based on her notes of an exit interview that she had conducted, Elliot believes that she gave DeMarco a positive reference.  Additionally, Elliot's personal policy is to provide a reference only when that reference would be positive.  *Id.*   She disputes the accuracy of Mikalsen's notes, and doubts that her statements were accurately recorded.  *Id.*  The third reference was from Dr. Steven Snyder, a surgeon at Suffolk Oral Surgery Associates, where DeMarco worked from 1996 to 1998.  CPMP's Rule 56.1 Statement ¶ 51; Pl.'s Rule 56.1 Counter-statement ¶ 51.  He was unavailable when Mikalsen called and did not return his phone call.  *Id.*   Mikalsen noticed that DeMarco had not listed anyone from Mather on her reference form, and made a mental note to request from DeMarco the name of the person to whom she reported at Mather.  Mikalsen Dep. at 188-89

Mikalsen reported the outcome of his reference checks to Teriaco, who suggested that he inform Human Resources of the results.  Mikalsen states that he then called Bergan and summarized the references, and Bergan instructed Mikalsen to get additional references from DeMarco.  Teriaco Dep. at 187-190.  As noted above, DeMarco disputes the chronology:  she states that Mikalsen and Teriaco did not inform Bergan of any issue with respect to DeMarco's references until after DeMarco's pregnancy and sexual harassment lawsuit against Gersh had been disclosed.

F.      *DeMarco's Disclosure of Her Lawsuit Against Gersh*

In an EEOC charge filed on September 20, 2005, DeMarco filed a charge of sexual harassment, pregnancy discrimination and retaliation against Gersh.  DeMarco Aff. ¶18.

On September 21, 2005, she held a press conference concerning the charge. CPMP's Rule 56.1

Statement ¶ 56; Pl.'s Rule 56.1 Counter-statement ¶ 56. On September 22, 2008, DeMarco

called Mikalsen to tell him that she was filing a lawsuit against her prior employer. Mikalsen

Dep. at 217, 225. Mikalsen states that she "called [him] and admitted that she had lied to CPMP

and had deliberately falsified her employment history based on the advice of her lawyer," but

DeMarco disputes this characterization. Mikalsen Aff. ¶ 24. DeMarco claims that she told

Mikalsen that she wanted to disclose the situation at Gersh because her pregnancy was about to

be publicly reported. DeMarco Dep. 115 -116.

 Mikalsen reported the phone call to Teriaco, and they decided to call Bergan to

discuss DeMarco's phone call. CPMP's Rule 56.1 Statement ¶ 59; Pl.'s Rule 56.1 Counter-

statement ¶ 59. Teriaco and Mikalsen told Bergan that DeMarco had lied to them during her

September 14, 2005 interview and that she could not be trusted with highly confidential

information. Mikalsen Dep. at 235; Teriaco Dep. at 199-202. Bergan then spoke to Search

Committee members, who also thought that the recommendation to hire DeMarco should be

reconsidered in light of her dishonesty during the interview process. Bergan Aff. ¶ 33. Agreeing

with the consensus of the Search Committee to reconsider its recommendation, Cohen (CPMP's

Executive Director) directed Bergan to speak with the Human Resources Department at SUNY

regarding CPMP's reservations about hiring DeMarco for the position of data analyst.

 On September 26, 2005, Bergan tried to contact Lynn Johnson, Director of the

Human Resource Office at Stony Brook, for advice on how to deal with DeMarco but Johnson

was away on vacation. So Bergan contacted Paul Kelly, Research Foundation's Assistant Vice

President for Human Resources, instead. Kelly offered three potential options for dealing with

the situation, including hiring DeMarco until she went on maternity leave and not hiring her

back; not hiring her at all; or checking with human resources on issues such as this and seeing how they handled it in the past. Bergan Aff., Ex. 9. Bergan affirms that the first option was unacceptable as it was contrary to the policies and procedures of the Research Foundation, SUNY and CPMP. Bergan Aff. ¶ 37.

After speaking with Bergan, Kelly e-mailed Barbara Pell, Research Foundation's Employee Relations and Affirmative Action Manager. He summarized his conversation with Bergan and requested guidance. The e-mail stated that CPMP had learned that DeMarco had "misrepresented [her] employment history on her application and in the interview." Embry Decl., Ex. 12. He noted that DeMarco's conduct had raised issues with her trustworthiness, an important qualification for the position of data analyst. *Id.*

Bergan then spoke with Pell, who advised Bergan that DeMarco's falsification of her employment history was clearly a valid reason for not offering DeMarco a job. Pell agreed that a written offer should not be made to DeMarco in light of her prevarications. Pell Dep. at 23; Cohen Dep. at 90-91. She advised Bergan simply to tell DeMarco that she was not a "good fit" for CPMP. Pell Dep. at 28; Bergan Dep. at 238-39.

On October 4 or 5, 2005, DeMarco called Mikalsen and Bergan to check on the status of her job offer. Apparently anticipating litigation, DeMarco recorded the calls. Bergan informed her that she would not be receiving a job offer because she was "not a good fit for [the] organization." Wigdor Aff, Ex. P. at 4. DeMarco wanted a more specific reason, so Bergan advised her to call Pell, who similarly informed DeMarco that she would not be a good fit for the organization. *Id.* at 6. Pell informed her that the decision not to hire her had nothing to do with her pregnancy or her pending harassment suit against Gersh. *Id.*

At DeMarco's deposition, she admitted that no one at CPMP or at the Research Foundation ever stated, implied or otherwise indicated that she was not being hired because she had filed a lawsuit against Gersh Academy or because she was pregnant. DeMarco Dep. at 160-65.

The data analyst position for which DeMarco had applied remained unfilled after DeMarco was not hired because CPMP decided to purchase computer software that could perform some of the same functions as a data analyst. Bergan Dep. at 266-268.

In the past, CPMP has terminated employees and employment offers have been withdrawn where it was discovered that the applicant failed to disclose previous employment. Pell Dep. at 50-51.

On November 14, 2005, DeMarco filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). In her charge, DeMarco did not deny that she had deliberately failed to disclose her employment with Gersh, but she claimed that her actions were justified in light of her fear of retaliation by Gersh. Embry Decl., Ex. 15. On June 7, 2006, the EEOC found that it could not conclude that the information obtained established violations of applicable discrimination laws. Embry Decl., Ex. 16.

On August 22, 2006, DeMarco filed this action against Research Foundation and CPMP alleging that the failure to hire her for the data analyst position was based on unlawful retaliation and pregnancy discrimination. Embry Decl., Ex. 1.

DISCUSSION

A.     *The Summary Judgment Standard*

Under Federal Rule of Civil Procedure 56(c), a moving party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any

affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223 (2d Cir. 1994) ("[T]he burden is on the moving party to demonstrate that no genuine issue respecting any material fact exists." (citing *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975))). A fact is "material" within the meaning of Rule 56 when its resolution "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (*per curiam*), and *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989)). Therefore, although a court "should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods. Co.*, 530 U.S. 133, 151 (2000).

However, the nonmoving party cannot survive summary judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is proper when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case." *Gallo*, 22 F.3d at 1223-24 (citations omitted).

B.      *DeMarco's Claim of Pregnancy Discrimination*

Title VII pregnancy discrimination claims at the summary judgment stage are analyzed using the burden-shifting paradigm articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under this analysis,

> a plaintiff first bears the "minimal" burden of setting out a prima facie discrimination case, and is then aided by a presumption of discrimination unless the defendant proffers a "legitimate, nondiscriminatory reason" for the adverse employment action, in which event, the presumption evaporates and the plaintiff must prove that the employer's proffered reason was a pretext for discrimination.

*McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 215 (2d Cir. 2006) (citations omitted).

1.      *The Prima Facie Case*

To establish a prima facie case of discrimination, the plaintiff must show (i) membership in a protected class; (ii) qualifications for the position; (iii) an adverse employment action; and (iv) circumstances surrounding that action giving rise to an inference of discrimination.  *Texas Dep't. of County Affairs v. Burdine*, 450 U.S. 248, 252-253 (1981); *Collins v. NYC Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002).   Alternatively, in failure to hire cases, the plaintiff may establish the fourth element by showing that the position remained open and was ultimately filled by a non-pregnant employee.  *See Kerzer v. Kingly Mfg.*, 156 F.3d 396, 401 (2d Cir. 1998); *see also Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir. 1995).   Both Research Foundation and CPMP concede that DeMarco is a member of a protected class and that she can show that she suffered an adverse employment action.  However, defendants contend that DeMarco has failed to satisfy the second and fourth prongs of her prima facie case.

A plaintiff who wishes to demonstrate that she was qualified for the position for which she applied need not show that her potential performance would have been "flawless or

superior;" rather, she must show that she "possesse[d] the basic skills necessary for performance of [the] job." *De La Cruz v. N.Y. City Human Res. Admin. Dep't of Social Serv.*, 82 F.3d 16, 20 (2d Cir. 1996) (citing *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1155 (2d Cir. 1978)).  The purpose of the qualification prong is simply to help "eliminate[ ] the most common nondiscriminatory reasons for the plaintiff's rejection." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981); *Gregory v. Daly*, 243 F.3d 687, 695 (2d Cir. 2001); *see also Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 n.44 (1977) ("[T]he *McDonnell Douglas* formula . . . demand[s] that the alleged discriminatee demonstrate at least that his rejection did not result from the two most common legitimate reasons on which an employer might rely to reject a job applicant:  an absolute or relative lack of qualifications or the absence of a vacancy in the job sought.").

The Second Circuit has held that "being 'qualified' refers to the criteria the employer has specified for the position." *Thornley v. Penton Publ'g, Inc.*, 104 F.3d 26, 29 (2d Cir. 1997).  Defendants assert, and plaintiff does not contest, that data analysts in the Department of Information Systems must be honest and trustworthy in light of the sensitive and private information, both medical and financial, they use and have access to.  Indeed, though "[t]rustworthiness, reliability, veracity, good judgment are all material qualifications for any job," *see Williams v. Boorstein*, 663 F.2d 109 (D.C. Cir. 1980) (finding that plaintiff did not satisfy the "qualification" requirement of the prima facie case because his lying made him an unfit employee), CPMP had good reason to be acutely sensitive to the trustworthiness of its prospective data analysts.  Given the access they would have if hired to sensitive patient health information as well as to the identification and financial information of physicians and patients, dishonest applicants would not qualify for this position.

CPMP contends that even when the facts are viewed in the light most favorable to DeMarco, her conduct during the interview process disqualified her from the position. I agree for two independent reasons. First, even DeMarco acknowledges (if only implicitly) that she would not be qualified for the job if she lied to her interviewers about something so fundamental as to whether she had been working in the previous four months, since she left Mather. The defendants assert, based on admissible testimony, that DeMarco indeed addressed this obviously important issue and falsely stated during her August 29, 2005 interview that she had not been working since she left Mather. Though DeMarco stated she does not *recall* making that false statement, and even that she does not *believe* she did, neither of those statements is necessarily inconsistent with the defendant's evidence. Conspicuously absent from DeMarco's extensive sworn statements is a straightforward declaration that she did not lie at the August 29 interview about whether she had worked in the previous four months.[5] Her claimed failure of recollection and uncertain belief are insufficient to place that fact in genuine issue. *See FDIC v. Nat'l Union Fire Ins.*, 205 F.2d 66, 75 (2d Cir. 2000); *I.V. Servs. of Am., Inc. v. Inn Development and Management, Inc.*, 182 F.3d 51, 54-56 (1st Cir. 1999).

Second, DeMarco admits that at the very least, she deliberately withheld her recent employment history from CPMP, and I am persuaded that her conduct rendered her unqualified for the position she sought even if she did not affirmatively lie to CPMP about the

---

[5] DeMarco's counsel was questioned about this at oral argument and was granted permission to file supplemental citations to the record. The citations provided in counsel's letter dated August 29, 2008, fail to refute the defendants' evidence. All of them focus not on DeMarco's testimony regarding what she *said* in the interview, but rather on her testimony about what was *asked*. In a strikingly repetitive fashion, DeMarco insisted again and again at her deposition that she was not *specifically asked* whether she worked anywhere after she left Mather. *See* DeMarco Dep. at 107 ("Not specifically."); 108 ("It wasn't specifically asked."), 131 ("it was not specifically asked"); 152 ("They never specifically asked me."). The same iteration is repeated twice in the cited Affidavit. DeMarco Aff. at ¶¶ 12 and 14. None of cited testimony contradicts the defendants' evidence that DeMarco stated during the August 29 interview (irrespective of what was "specifically asked") that she had not been working since she left Mather in April. Neither does DeMarco's assertion in her affidavit that she was not dishonest during the September interview. In sum, despite being given the additional opportunity to demonstrate a genuine issue of fact on this issue, DeMarco has failed to do so.

subject.  DeMarco's opposition to CPMP's motion on this issue, which clings to the claimed literal truth of DeMarco's statements, and to her interviewers' failure to frame their questions precisely, reads as though DeMarco were fending off a perjury charge.[6]  But she is suing a prospective employer, and prospective employers are entitled to insist that their employees be open, honest and forthright with them about facts relevant to the hiring decision.  Literally truthful statements can be seriously misleading, especially when they are combined with material omissions.  Prospective employers can refuse to hire applicants who engage in such conduct during their interviews.  Put another way, if DeMarco's liberty were at stake, she would be fully entitled to play "Gotcha!" with her questioners, for literally truthful answers are not perjury even where they intentionally mislead.  But she has no legitimate claim to the job she sought where she intentionally misled her interviewers on a subject material to their decision.

No rationale juror could fail to conclude -- even on DeMarco's version of the facts -- that she intentionally misled CPMP.  In support of her application for the data analyst position, DeMarco faxed to CPMP a resume on July 21, 2005.  The resume made no mention of the job at Gersh that DeMarco held at the time, and had held since April of that year.  It thus created the false impression that the position at Mather, which ended in April of 2005, was DeMarco's most recent employment.  DeMarco's half-hearted claim that the resume was not misleading because it used the heading "Experience *Summary*," not simply "Experience," is too cute by half.  Similarly, her fleeting suggestions that her job at Gersh was not listed because it was somehow irrelevant are belied by her deposition testimony that she failed to disclose it because she did not want CPMP to know about it.

---

[6]     *See*, *e.g.*, *Bronston v. United States*, 409 U.S. 352, 360 (1973) (a "wily witness" who intentionally misleads a questioner may not be prosecuted for perjury "as long as the witness speaks the literal truth").

DeMarco furthered her plan to deceive CPMP at her August 29 interview. In an apparent effort to create in CPMP a false belief that she was not only not working, but did not have the time to work, DeMarco's testimony included the following exchange:

> Q. What explanation did you give them [at the August 29, 2005 interview] as to why you left your job at Mather Hospital?
>
> A. If I can recall correctly, it was because I was in school full-time and working at Mather and the job was very demanding as far as bringing home work on the weekends and they both conflicted with one another, my schooling and my position.

DeMarco Dep. at 101. That answer obviously suggested, falsely, that DeMarco had left Mather (and left working altogether) to devote her time to a full-time education.

Then, according to DeMarco, she was asked "Are you working, now?," to which she said "no," smug in the knowledge that she had left Gersh a few days earlier. Evoking memories of "it depends what the meaning of the word 'is' is," DeMarco suggested the CPMP interviewers have only themselves to blame:

> Q: Is it your testimony that none of the committee members asked you what you have been doing since April of 2005?
>
> A: They asked me if I was working now. They didn't say specifically, where have you worked afterwards. They weren't specific as to have you worked after Mather.
>
> Q: They asked me, "Are you currently still in school?" At the time, yes, I was currently still in school.
>
> "Are you working now?"
>
> "No, I'm not working now."

DeMarco Dep. at 99-100. But job interviews are not exercises in semantics. When DeMarco, spurred by her own press conference after filing her discrimination charge against Gersh, finally fessed up to her deception, CPMP found that her lack of trustworthiness disqualified her from the

position.[7]  Because I conclude that a jury could not rationally find otherwise, CPMP is entitled to

summary judgment.

Obviously, whether a job applicant is currently employed is a material matter to a

prospective employer.  If she is, the many relevant areas of inquiry include why the applicant

chose that particular position, what her duties include, and why she wishes to move away from

the job.  DeMarco was entitled to an employment decision by CPMP that was free from any

consideration of her pregnancy or the fact that she was anticipating charging Gersh with sexual

harassment.  But she was not entitled to create the false impression that her employment at Gersh

never happened, and CPMP was entitled to deem her unqualified for the data analyst position

after it discovered that she had done just that.  *Cf., e.g.*, *Douglas v. Dist. Council 37 Mun.*

*Employees' Educ. Fund Trust*, 207 F. Supp. 2d 282, 290 (S.D.N.Y. 2002) ("failure to disclose

that [plaintiff] was actually fired by SUNY, is not only deliberately misleading, but tantamount

to falsehood, however subtle the gloss of semantics or technicalities employed to mask the

reality.").

In sum, even when the facts are viewed in the light most favorable to DeMarco, a

reasonable jury could not fail to conclude that she intentionally deceived CPMP regarding her

recent employment history during the application process.  Because the job required

---

[7]          DeMarco asserts that because she told Teriaco and Mikalsen at her second interview that she spent
her time after Mather going to school, "doing miscellaneous stuff, and . . . looking for [a] more full-time, steady
position," DeMarco Dep. at 107, defendants were on notice that she had other work experiences that were not listed
on her resume.  However, at oral argument, counsel for DeMarco was hard-pressed to name his client's
"miscellaneous" activities, ultimately referencing her "babysitting" activities in support of her response.  Again,
vague and elusive statements about post-Mather activities (even if literally truthful) do not alter the fact that
DeMarco admits to deliberately withholding her employment at Gersh from the defendants, and that deception
rendered her unqualified for a position that demands honesty.

trustworthiness, good judgment and honesty, DeMarco was unqualified for the position. Accordingly, she has failed to establish a prima facie case of discrimination.[8]

In any event, assuming *arguendo* that DeMarco satisfied her prima facie case, her claims would still not survive summary judgment. As discussed below, the defendants have proffered a legitimate, non-discriminatory reason for failing to hire her, and DeMarco has failed to adduce evidence from which a jury could find that the reason was a pretext for discrimination.

    2.    *Defendants' Legitimate, Non-Discriminatory Reason*

In proffering a non-discriminatory reason for a challenged employment action, a defendant's "burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prod. Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993)). Defendants defend their decision not to hire DeMarco by asserting that she intentionally misrepresented her employment history during the application process. Such deception indeed "constitutes a legitimate, non-discriminatory reason for failing to hire an applicant." *Caidor v. Potter*, No. 02-cv-1486 (NAM) (DEP), 2007 WL 2847229, at *9 (N.D.N.Y. Sept. 26, 2007); *see also Woodell v. United Way of Dutchess County*, 357 F. Supp. 2d 761, 772. Defendants have thus met their burden.

    3.    *No Pretext*

Under the *McDonnell Douglas* test, DeMarco must respond to the asserted basis for CPMP's refusal to hire her with facts sufficient to warrant a reasonable jury finding by a preponderance of the evidence that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves v. Sanderson Plumbing Prod. Inc*., 530 U.S. 133, 143 (2000). "[A] reason cannot be proved to be a 'pretext for discrimination' unless it is

---

[8]     In light of this conclusion, I need not address defendants' contention that DeMarco has failed to satisfy the fourth prong of the prima facie case.

shown both that the reason was false, and that discrimination was the real reason," *St. Mary's Honor Ctr.*, 509 U.S. at 515.

DeMarco makes several arguments in support of her claim that defendants' proffered reason for not hiring her is a pretext for discrimination. First, she maintains that she was not even dishonest during the application process. For the reasons discussed above, I reject this argument. Second, DeMarco highlights the temporal proximity between her disclosure of her pregnancy and defendants' failure to hire her. It is true that the timing of events alone may support an inference of discrimination sufficient to satisfy a plaintiff's burden to make out a prima facie case, but "the mere fact that a protected action preceded an adverse employment action is not, by itself, sufficient to satisfy plaintiff's burden at the third step of the *McDonnell Douglas* analysis." *Bainlardi v. SBC Warburg, Inc.,* No. 97-cv-2861 (KTD) (HBP), 1998 WL 556032, at *6 (S.D.N.Y. Sept. 1, 1998). The close proximity between the defendants' decision and DeMarco's announcement is insufficient to demonstrate pretext. *Forde v. Beth Israel Medical Center*, 546 F. Supp. 2d 142, 152 (S.D.N.Y. 2008). Furthermore, DeMarco's dishonesty came to light at the same time she disclosed her pregnancy, weakening any claim of discrimination that is based on temporal proximity between the revelation of her pregnancy and the decision not to hire her. *See, e.g.*, *Gurry v. Merck & Co., Inc*., 2003 WL 1878414, at *6 (discovery of a misrepresentation on plaintiff's employment application weakens the inference of causation that arises from a temporal connection).

Third, DeMarco contends that when defendants failed to hire her, they relied on multiple explanations, creating an issue of fact as to whether defendants' proffered reasons are true. It is true that defendants provided DeMarco with several explanations as to why defendants did not hire her, including that she was not a "good fit"; that she had poor references;

and that she misrepresented her work experience on her application and during her interviews.

"Inconsistent and varying explanations for [defendants'] decision to terminate a plaintiff" may create "a jury issue on the question of pretext," *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 170 (2d Cir. 2001) (citation omitted), so long as the explanations are materially inconsistent with one another. *Matthews v. Huntington*, 499 F. Supp. 2d 258, 267 n.6 (E.D.N.Y. 2007). The defendants' explanations are not inconsistent with each other.

DeMarco also contends that inconsistencies in the record regarding CPMP's reference checks serve as evidence of pretext. Mikalsen, who called DeMarco's references, reported that Sherry Elliot alluded to attendance problems. In her affidavit, however, Elliot stated that she did not recall giving DeMarco a negative reference, and that any absences that DeMarco did have were not problematic. DeMarco contends that the defendants did not even conduct the reference checks until after she had disclosed that she was pregnant, and that they did so only as a pretext for failing to hire her because of her pregnancy. She argues that CPMP's evidence that Mikalsen called her references in September and made a record of the phone calls soon thereafter is inconsistent with computer forensic evidence that the relevant documents were created in late October. DeMarco makes much of this alleged inconsistency, but even assuming *arguendo* that she has established that CPMP's reliance on her reference checks (or on her "fit" with the company) was pretextual, DeMarco has still not provided sufficient evidence that it was pretext for *discrimination*, and thus her claim fails as a matter of law.

In *Reeves,* the Supreme Court held that "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves*, 530 U.S. at 147. The Court elaborated as follows:

> This is not to say that such a showing by the plaintiff will *always* be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational fact-finder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

*Id.* at 148; *see also Roge v. NYP Holdings, Inc*., 257 F.3d 164, 170-171 (2d Cir. 2001) (finding that the plaintiff had not offered any evidence that defendant's justifications, even if they were pretextual, served as pretext for age discrimination). Here, defendants' proffered reasons for not hiring DeMarco are not inconsistent with those given in 2005, and DeMarco has not presented any evidence that her pregnancy was a factor in the decision not to hire her.

On September 22, 2005, DeMarco called Mikalsen at CPMP and disclosed her pregnancy, her charge of sexual harassment against Gersh, and her deception of CPMP. Her revelations made it clear that in her resume, in her August 29 interview and in her September 14 interview, DeMarco had duped CPMP. Both the sworn testimony of the CPMP employees and contemporaneous e-mail records (*see* Rosenberg Reply Dec., Ex. 1) prove that within days (by no later than September 27), a decision had been made that DeMarco could not be trusted with the confidential information the data analyst job would place in her possession.

DeMarco complains that the CPMP employees she spoke to in October were not completely forthright with her. They had told her in September she was a good fit with CPMP, only to say in October (on instructions from their superiors, *see id*. at 2) that she was *not* a good fit. They might have told her she was no longer a good fit because she lost their trust, but Title VII does not police such communications.

In short, there is *no* evidence of pregnancy discrimination. In arguing otherwise, DeMarco relies heavily on Bergan's handwritten notes of a conversation Bergan had with Kelly (who was an Assistant Vice President for Human Resources at the Research Foundation) on September 26. After Bergan described DeMarco's deception during the interviewing process, Kelly outlined three options: (1) hiring DeMarco but not hiring her back after her maternity leave; (2) not hiring her; and (3) checking to see how similar issues had been handled in the past. I disagree that Kelly's first suggested option evidences pregnancy discrimination. Not only was it flatly rejected by Bergan as contrary to CPMP policy, but it was proposed solely as a means of carrying out CPMP's legitimate decision not to have DeMarco in a data analyst position. The mere fact that one proposed (and rejected) method of achieving that lawful result would itself have violated the Family and Medical Leave Act does not alter the fact that CPMP's decision not to hire DeMarco was based squarely on legitimate grounds. As the Supreme Court stated in *Reeves*, an employer is entitled to summary judgment "if the record conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason [is] untrue and there [is] abundant and incontroverted evidence that no discrimination had occurred." 530 U.S. at 148. This is just such a case, and accordingly CPMP's action is granted.

C.      *DeMarco's Claim of Retaliation*

DeMarco claims that the defendants retaliated against her in violation of Title VII (and the parallel state law[9]) because they refused to hire her as a data analyst days after finding out that she had filed a lawsuit against her former employer, Gersh.

_____

[9]      The analysis under NYSHRL is parallel to that of DeMarco's Title VII retaliation claims. *See Springle v. Metropolitan Trans. Auth.*, No. 06-cv-734 (GEL), 2008 WL 331362, at *8 (S.D.N.Y. Feb. 1, 2008).

Title VII makes it unlawful for an employer to discriminate against an employee or prospective employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  Title VII is violated when "a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause."  *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir. 1993).  The *McDonnell Douglas* burden shifting analysis used in claims of discrimination in violation of Title VII also applies to retaliation claims brought pursuant to Title VII.  *See Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996).

To establish a prima facie case of retaliation DeMarco must show that: (1) she participated in a protected activity, (2) defendants knew of her participation in the protected activity, (3) she suffered an adverse employment action, and (4) there was a causal connection between the protected activity and the adverse employment action.  *Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir. 1991).

Defendants concede that DeMarco can establish the first three prongs of the prima facie retaliation case, but contend that she cannot demonstrate a causal connection between her disclosure that she initiated a lawsuit against Gersh and CPMP's decision not to hire her for the data analyst position.  I disagree.

"Proof of causal connection can be established indirectly by showing that the protected activity was followed closely by discriminatory treatment, *Davis v. State Univ. of N.Y.*, 802 F.2d 638, 642 (2d Cir. 1986), or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, S*immons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1188-89 (11th Cir.), cert. denied, 474 U.S. 981, or directly through evidence of retaliatory animus directed against a plaintiff by the defendant."  *DeCintio v. Westchester County Med. Ctr.*,

821 F.2d 111 (2d Cir. 1987). The burden at the prima facie stage of a Title VII case is "minimal." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 153-54 (2d Cir. 2000).

While DeMarco has shown neither retaliatory animus nor evidence of disparate treatment of fellow employees who engaged in similar conduct, she has satisfied her prima facie case because defendants' decision not to hire her occurred within days of her disclosure that she had filed a lawsuit against her former employer. Temporal proximity alone is sufficient to meet her initial burden. *See, e.g., Gurry v. Merck & Co., Inc.*, 2003 WL 1878414, *6 (stating that even though misrepresenting facts on an employment application constituted an intervening event that served to weaken an inference of causation, plaintiff still met his de minimis burden of establishing a prima facie case).

Because DeMarco has satisfied the requirements of the prima facie case, the next step of the burden-shifting paradigm requires defendants to proffer a legitimate, non-discriminatory reason for failing to hire her. As discussed above, defendants have cited DeMarco's dishonesty during the application process as the reason for their decision. Defendants have thus satisfied their burden.

To survive summary judgment, DeMarco must present evidence from which a rational jury could conclude that the proffered reason was a pretext for a retaliatory animus. As with her discrimination claim, DeMarco has not provided any evidence that the defendants' decision not to hire her was motivated by a desire to retaliate against her for filing an EEOC claim against her former employer. She relies heavily on the temporal proximity between the disclosure that she had filed an EEOC claim against Gersh and the adverse employment action, but her dishonesty during the application process was an intervening causal event that defeats the inference of causation. *See, e.g., Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552, 562

(S.D.N.Y. 2005); *Valentine v. Standard & Poor's*, 50 F. Supp. 2d 262, 291 (S.D.N.Y. 1998) (recognizing that temporal proximity between plaintiff's filing of EEOC charge and his termination sufficed to establish causal nexus for purposes of prima facie case, but nevertheless the court granted defendant's motion for summary judgment on the ground that plaintiff had not offered concrete evidence upon which a reasonable jury could return a verdict in his favor); *Gurry v. Merck & Co., Inc.*, 2003 WL 1878414, *6 ("[R]eliance on . . . prima facie proof, based solely on timing and weakened by the interposition of a new incident, is insufficient to survive summary judgment."). Because no jury could rationally find that the defendants were motivated, even in part, by a desire to punish DeMarco for filing her charge against Gersh, the defendants' motion for summary judgment on the retaliation claim is granted.

CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted in its entirety.[10]

So ordered.

John Gleeson, U.S.D.J.

Dated: September 15, 2008
       Brooklyn, New York

---

[10]    In light of this decision, I need not address the Research Foundation's argument that if any liability were to arise from CPMP's alleged discriminatory or retaliatory acts, it could not be imputed to the Research Foundation.